# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ERIC OLSON<br>6919 Holter Vista Drive<br>Frederick, Maryland 21702-3604<br><br>NILS OLSON<br>6767 Covenant Court<br>Frederick, Maryland 21702-5813<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 12-01924 |

## COMPLAINT AND JURY DEMAND

Plaintiffs, Eric and Nils Olson, allege as follows against Defendant, United States of America:

## NATURE OF THE ACTION

1.     This lawsuit seeks damages for a host of ongoing misdeeds and illegal acts against American citizens arising from the grossly negligent failure of the Central Intelligence Agency ("CIA" or "Agency") to supervise its employees over the course of nearly sixty years. That failure on the part of the CIA has directly resulted in enormous harm to Plaintiffs and their family.

2.     Driven by fear of the Soviet Union and the People's Republic of China in the 1950s, the United States government tested chemical and biological weapons on human subjects without their knowledge or consent.  These tests included administering LSD, a hallucinogenic drug, to human subjects to assess its effects on human behavior.  In 1953, negligently supervised

CIA employees administered LSD to one of the CIA's own scientists, Dr. Frank Olson, without his knowledge or consent, and, a few days later, murdered Dr. Olson by pushing him from a thirteenth story window of a hotel in New York City.  CIA employees, again acting without proper supervision, then failed to disclose the truth to the Olson family and instead provided disinformation about the circumstances of Dr. Olson's death, claiming that he had committed suicide.  Thus began a cover-up that continues to this day.

3.      As a result of the actions or omissions of employees that the CIA negligently failed to supervise, Plaintiffs, who are Dr. Olson's surviving children, have suffered and continue to suffer severe emotional harm.

## PARTIES

4.      Plaintiffs Eric and Nils Olson are individuals who currently reside in Frederick, Maryland.

5.      Defendant United States of America is sued on account of the tortious conduct of employees of the CIA as set forth in this Complaint.

## JURISDICTION AND VENUE

6.      This Court has personal and subject matter jurisdiction under 28 U.S.C. §§ 1346(b) and 2671−2680.  Pursuant to 28 U.S.C. § 2675, Plaintiffs filed an administrative claim with the CIA on January 18, 2012 that was denied by the CIA in a letter dated July 12, 2012 and delivered by certified mail.

7.      Venue is proper in this Court under 28 U.S.C. § 1402(b).

## FACTUAL ALLEGATIONS

### The CIA's Development of Methods for Biological Warfare and Mind Control

8.      Beginning in the late 1940s and early 1950s, the United States government grew fearful that the Soviet Union, the People's Republic of China, and other countries in the Communist bloc had developed chemical and biological substances for use in interrogations, brainwashing, and attacks against the United States and its allies.  The United States government was particularly concerned about the potential use of LSD by the Soviet Union and the People's Republic of China.

9.      As a result, the United States government began to research and develop chemical and biological substances for defensive, as well as offensive, use.  Upon information and belief, potential offensive uses included biological warfare and mind control.

10.      In 1953, as part of this effort, Allen W. Dulles, then Director of the CIA, launched MKULTRA, a highly classified program to research and develop chemical, biological, and radiological materials for use in clandestine operations.

11.      According to testimony that Dr. Sidney Gottlieb, Chief of the Chemical Divisions of the CIA's Technical Support Staff ("TSS") during the early 1950s, gave before the Senate Subcommittee on Health and Scientific Research, as well as the findings of the Senate Select Committee to Study Government Operations (the "Church Committee"), through MKULTRA and similar programs, including but not limited to BLUEBIRD and ARTICHOKE, the CIA sought to "investigate whether and how it was possible to modify an individual's behavior by [covert] means," "perfect techniques . . . for the abstraction of information from individuals whether willing or not," and "develop means for the control of the activities and mental capacities of individuals whether willing or not."

12.     MKULTRA included the testing of biological and chemical substances, including LSD, on human subjects.  Upon information and belief, the CIA believed that LSD could be used as a truth serum.

13.     Due to the potential risks associated with human testing, the CIA explicitly prohibited CIA employees from administering LSD to human subjects without first obtaining permission from the Agency's Deputy Director of Plans.  Employees also were required to advise the Assistant Deputy Director of Plans before proceeding with any human testing of LSD. Nonetheless, as set forth below, CIA employees, acting without adequate supervision, administered LSD to human subjects without their consent.

**Dr. Olson's Involvement In and Concerns Regarding The CIA's Use of Biological Weapons and Mind Control Techniques**

14.     Beginning in 1950, the CIA associated with the Special Operations Division of the United States Army's Biological Laboratory ("Special Operations"), located at Camp Detrick, Maryland, to research and develop biological agents and toxins.  Among other things, Special Operations sought to (a) assess the vulnerability of the United States and its assets to biological attack and (b) develop techniques for the offensive use of biological weapons.

15.     Dr. Frank Olson, the father of Plaintiffs Eric and Nils Olson, joined Special Operations at its inception in 1950.  In 1952 and 1953, Dr. Olson acted as Branch Chief, Acting Chief, and Special Assistant to the Division Chief.

16.     Dr. Olson was a bioweapons expert.  He specialized in aerobiology, which concerns the transmission of organic particles, such as biological agents, through air.

17.     Upon information and belief, Dr. Olson was issued a "Q" clearance because, in his work for the CIA, he needed to be privy to a wide range of extremely sensitive information concerning the use of biological weapons and mind control techniques.

18.     As part of his work for the CIA, Dr. Olson traveled to Europe throughout 1953. There he visited Porton Down, a biological and chemical research center in London, as well as bases in Paris, Norway, and West Germany.

19.     Dr. William Sargant, a psychiatrist who consulted for MI6 and worked with Dr. Olson in Europe, has stated that Dr. Olson witnessed extreme interrogations in which the CIA committed murder using biological agents that Dr. Olson had developed.

20.     Concerned that Dr. Olson had serious misgivings related to those murders and might therefore pose a security risk, Dr. Sargant recommended to his superiors that Dr. Olson no longer have access to classified research facilities in Britain, including Porton Down.

21.     Also apparently suspicious of Dr. Olson's loyalties, someone at the CIA placed a memorandum in Dr. Olson's file at Camp Detrick suggesting that Dr. Olson might have committed a security violation in connection with his trip to Paris and Norway.

**The Wrongful Death of Dr. Olson**

22.     Thereafter, on Wednesday, November 18, and Thursday, November 19, 1953, Dr. Olson attended a meeting at Deep Creek Lake, Maryland.  Ten men attended the meeting: seven from Special Operations and three from the CIA's TSS.  The three men from TSS included Dr. Gottlieb and Dr. Robert Lashbrook, his deputy.

23.     After dinner on Thursday, November 19, 1953, Dr. Gottlieb instructed Dr. Lashbrook to place LSD in a bottle of Cointreau without telling any of the others in attendance.  Several of the men, including Dr. Olson, drank from the bottle without knowing that it had been laced with LSD and without having consented to act as guinea pigs for this "experiment" into the effects of LSD on humans.  Neither Dr. Gottlieb nor Dr. Lashbrook

informed the men that the bottle contained LSD until approximately twenty minutes after they had ingested it.

24.     Despite the strict CIA requirement that employees obtain personal approval from the Deputy Director of Plans before engaging in any experiments using LSD, Dr. Gottlieb had sought approval to administer LSD at Deep Creek Lake only from his immediate supervisor, Colonel James H. Drum.  Col. Drum and Dr. Lashbrook likewise failed to seek official permission for the experiment.  Additionally, at no point did Dr. Gottlieb or anyone else involved advise the Assistant Deputy Director of Plans that they planned to conduct the experiment, let alone receive his approval to do so.

25.     On Tuesday, November 24, Dr. Olson expressed to his colleague, Col. Vincent Ruwet, that he was concerned about his ability to continue working for Special Operations and that he wanted to resign.  Upon information and belief, Dr. Olson's statement was based on his ethical concerns regarding the CIA's conduct, including the extreme interrogations he had witnessed and the experiment at Deep Creek Lake.  After speaking with Dr. Olson, Col. Ruwet called Dr. Gottlieb and Dr. Lashbrook.  Together the men determined to take Dr. Olson to New York City.

26.     Before the men left for New York, Col. Ruwet told Dr. Olson's wife that they were taking Dr. Olson for psychiatric treatment because he might be dangerous to his family. Dr. Olson, however, had never demonstrated violent tendencies in the past, and Col. Ruwet's comments instilled anxiety in Mrs. Olson.

27.     Dr. Lashbrook and Col. Ruwet accompanied Dr. Olson to New York, purportedly for a "psychiatric" consultation with Dr. Harold Abramson, but Dr. Abramson was not a psychiatrist; he was an allergist.

6

28.     Dr. Olson met with Dr. Abramson in his office immediately following his arrival in New York on Tuesday, November 24.  Dr. Abramson also visited Dr. Olson that evening at the Statler Hotel, where Dr. Olson, Col. Ruwet, and Dr. Lashbrook were staying.  At the Statler Hotel, Dr. Abramson, the allergist, gave Dr. Olson bourbon and several capsules of the sedative Nembutal, which he recommended Dr. Olson take as medically necessary.

29.     On Thanksgiving Day, Thursday, November 26, Dr. Lashbrook, Col. Ruwet, and Dr. Olson flew back to Washington, D.C.  But Dr. Olson did not get the chance to celebrate the holiday meal with his family because, according to Col. Ruwet and Dr. Lashbrook, Dr. Olson had to "continue" his "psychiatric treatment."  Dr. Lashbrook and Dr. Olson then returned to New York.

30.     The following day, Friday, November 27, Dr. Abramson, the allergist, recommended that Dr. Olson be hospitalized for "further" psychiatric treatment.  Accordingly, the CIA contacted Dr. Robert Gibson, a certified psychiatrist in Maryland, about treating Dr. Olson upon his return from New York.

31.     Later that same day, Dr. Olson telephoned his confused and anxious wife and informed her that he would be home the next day.  He likewise informed Col. Ruwet of his anticipated return.  Dr. Lashbrook and Dr. Olson then checked into the Statler Hotel.

32.     The men had two martinis each before bed that evening.  At approximately 2:30 in the morning on Saturday, November 28, Dr. Olson fell thirteen stories to his death from the window of room 1018A—the hotel room he was sharing with Dr. Lashbrook.

33.     After Dr. Olson plunged to his death from the hotel room that the men had shared, rather than providing assistance or inquiring into Dr. Olson's condition, Dr. Lashbrook made a series of phone calls.  He first called his supervisor, Dr. Gottlieb.  Dr. Lashbrook also called

Dr. Abramson, who stated that he "wanted to be kept out of the thing completely."  During one

of these calls, the hotel operator overheard one party, likely Dr. Lashbrook, say, "Well he's

gone."  The person on the other end of the call responded, "That's too bad."  At no point did

Dr. Lashbrook call the police.

34.     The circumstances surrounding Dr. Olson's wrongful death are substantially

similar to a "secret assassination" technique described in a manual that, upon information and

belief, the CIA published the year of Dr. Olson's death.  The manual suggested that "[f]or secret

assassination . . . the contrived accident is the most effective technique" because "[w]hen

successfully executed, it causes little excitement and is only casually investigated."  Specifically,

the manual counseled that "[t]he most efficient accident . . . is a fall of 75 feet or more onto a

hard surface . . . [such as one from] unscreened windows."  The manual also recommended that

assassins use a blunt object to inflict "[b]lows . . . directed to the temple," but noted that "[c]are

is required to insure [sic] that no wound or condition not attributable to the fall is discernable

after death."  Finally, the manual suggested that "[i]f the subject's personal habits make it

feasible, alcohol may be used . . . to prepare him for a contrived accident of any kind."  In

Dr. Olson's case:  Dr. Olson appeared to have been struck on the temple, though that wound was

originally concealed by the closed casket; Dr. Olson had been given LSD and a strong sedative

only days previous to his death, and he had consumed alcohol that evening; and Dr. Olson fell

more than 75 feet from the window of the Statler Hotel.

35.     Dr. Olson was still alive when he landed on the pavement thirteen stories below

the window of his hotel room.  The first person to reach Dr. Olson after his fall was Armand

Pastore, the night manager of the Statler Hotel.  Mr. Pastore heard Dr. Olson mumble something

incomprehensible shortly before he died.

36.     When the police and Mr. Pastore arrived in the hotel room that Dr. Lashbrook had shared with Dr. Olson, Dr. Lashbrook told them that he had been awakened by the sound of breaking glass as Dr. Olson crashed through the closed window.  Dr. Lashbrook later told Dr. Gibson, however, that he (Dr. Lashbrook) had awakened to see Dr. Olson standing in the middle of their hotel room and then saw him run across the room and throw himself through the window.  Dr. Lashbrook also gave inconsistent reports concerning whether the hotel room window had been open and whether the shade had been up or down.

37.     After days of abrupt comings and goings by Dr. Olson, and a holiday weekend spent concerned about the whereabouts and well-being of their husband and father, the Olson family was informed simply that Dr. Olson had died in a terrible accident.  The grieving family was further burdened by the disturbing, and false, assertion that Dr. Olson's body was too badly disfigured to allow for a viewing, and so there was a closed casket funeral.  In truth, the closed casket was not for the protection of the family, but rather that of the CIA—it concealed a hematoma on Dr. Olson's temple that was consistent with a blow to the head sustained before Dr. Olson traversed the window of the Statler Hotel.  This hematoma was omitted from the 1953 medical examiner's report.

38.     Dr. Olson's death began the severe emotional distress that plagues Plaintiffs to this day.  Dr. Olson's widow of thirty-eight years of age faced not only the loss of her husband's companionship but also the great uncertainty of how she would raise three children (five, seven, and nine years old) without their father.  Mrs. Olson thus began a rapid descent into alcoholism, of which the children were only aware through its effects on their mother's erratic disposition. The boys in turn were left without a father, and their replacement father figure—a man who had worked at Camp Detrick with Dr. Olson—sexually molested them for years.  These events, in

conjunction with Dr. Olson's death itself, rendered the Olson family's lives chaotic and
compounded their loss.

39.     On November 30, 1953, two days after Dr. Olson's wrongful death, the CIA
notified the Bureau of Employees Compensation that Dr. Olson appeared to have died in the
course of his official duties.  The CIA thereby began the process by which the Olson family
would receive benefits under the Federal Employees Compensation Act, of which it informed the
Olson family shortly thereafter.

40.     Within two weeks of Dr. Olson's death, the CIA's General Counsel issued the
CIA's official, but classified, position on Dr. Olson's death:  "[T]he death of Dr. Olson [was] the
result of circumstances arising out of [the Deep Creek Lake] experiment . . . there [was],
therefore, a direct causal connection between that experiment and his death."

41.     The CIA did not, however, disclose this conclusion to the Olson family.  Instead,
it simply declared that Dr. Olson had died during the course of his official duties without
providing any facts regarding the circumstances surrounding Dr. Olson's wrongful death.  The
CIA thereby made certain that the Olson family would receive death benefits under the Federal
Employees Compensation Act, but it also concealed its involvement in Dr. Olson's wrongful
death and ensured that the family would carry the burden of uncertainty as to the exact
circumstances of his death.  To further this end, the CIA "supplied complete cover for
[Dr.] Lashbrook so that his association with the CIA would remain a secret."

42.     Following the death of Dr. Olson, Col. Ruwet began visiting Mrs. Olson regularly
for drinks.  Thus began the alcoholism that would torment Mrs. Olson for the rest of her life.  Of
his interactions with Mrs. Olson following Dr. Olson's death, Col. Ruwet testified before

Congress that, "while [he] never recall[ed] having told Mrs. Olson anything that was flatly

untrue, [he] did allow her to think things that were not true."

43.     At the time of Dr. Olson's death, his sons, Plaintiffs Eric and Nils Olson, were

nine and five years old, respectively.  The family was deprived not only of a husband and father,

but also of full knowledge of what truly had happened to Dr. Olson, knowledge that Dr. Olson's

survivors lack to this day.

**Government Investigations Reveal Negligent Supervision by the CIA**

44.     Following Dr. Olson's death, the CIA conducted an internal investigation.  As a

result of that investigation, the CIA's General Counsel concluded that CIA employees had "a

very casual attitude [regarding] the way [the] experiment [at Deep Creek Lake] was conducted."

For one thing, before administering LSD to Dr. Olson, Dr. Gottlieb had sought approval only

from his immediate supervisor, Colonel James H. Drum.  Col. Drum in turn did not seek

approval for the experiment from anyone.  Both Dr. Gottlieb and Col. Drum therefore had

violated the CIA policy that required them to contact then Deputy Director of Plans Frank

Wisner in advance of any experiment.  Ultimately, the General Counsel further found that

although in some instances there may be a need to take risks in the interest of national security,

"when human health or life is at stake . . . at least the prudent, reasonable measures which can be

taken to minimize the risk must be taken" and that CIA employees' "failure to do so [in

Dr. Olson's case] was culpable negligence."

45.     As a result of the CIA's internal investigation, then Director Allen Dulles

criticized Dr. Gottlieb and Col. Drum for their judgment regarding the Deep Creek Lake

experiment.  Nonetheless, Director Dulles informed both Dr. Gottlieb and Col. Drum that they

were not being formally reprimanded and that their personnel files would not reflect the incident.

46.     In 1954, just months after Dr. Olson's death, the CIA and the Department of Justice ("DOJ") entered into a memorandum of understanding under which the CIA could determine whether to report its employees' potentially criminal actions to the DOJ.  Although this arrangement conflicted with the statutory requirement that all agencies report potentially criminal acts committed by their employees to the DOJ for possible prosecution, the CIA nevertheless negligently failed to report its employees' involvement in Dr. Olson's death to the DOJ.

47.     Twenty-two years later, the CIA's negligent supervision was independently confirmed.  In 1976, the Church Committee conducted an external investigation into the United States' intelligence activities.  The Church Committee identified four categories in which the CIA had routinely failed to monitor and control its employees' activities.

48.     One of the examples cited by the Church Committee was that the CIA had permitted employees to destroy records related to the testing of LSD on live subjects, including Dr. Olson.  The destruction of records further concealed the truth regarding the CIA's gross negligence and its employees' culpability in Dr. Olson's wrongful death.

49.     The Church Committee also cited the CIA for "irresponsible supervision" of experiments conducted by its employees, including its failure to require approval of the Deep Creek Lake experiment.

50.     In all, the Church Committee determined that the CIA had a history of "numerous failures in the monitoring and control of the testing and use of chemical and biological weapons."  The Church Committee found that Dr. Olson's case was but one example of the CIA's negligent supervision of its employees.

**Despite Multiple Opportunities to Come Clean, the CIA Continued to Conceal the Truth**

51.     In the early 1970s, President Gerald Ford formed the President's Commission on CIA Activities Within the United States, which was to be headed by then Vice President Nelson Rockefeller (the "Rockefeller Commission").  On June 10, 1975, the Rockefeller Commission published its report, which disclosed for the first time that in 1953 an Army scientist had fallen to his death from a hotel room in New York after the CIA had given him LSD.  The Rockefeller Commission's report did not disclose that the Army scientist was Frank Olson, and neither the CIA nor the Rockefeller Commission notified the Olson family of its findings.

52.     The following day, the Washington Post published a story publicizing the "LSD Suicide."  The Washington Post did not identify Dr. Olson as the victim.

53.     After he was confronted by the Olson family, Col. Ruwet confirmed that the Army scientist discussed in the Rockefeller Commission's report was Dr. Olson.  After living for years with the CIA's contrived story of the death of their husband and father, the family was now forced to confront, in a very public manner, disturbing new details about how his death came about.

54.     Based on Col. Ruwet's revelation, on July 10, 1975, the Olson family demanded "full disclosure of all relevant information concerning [Dr. Olson's] death, assurances from the government that this sort of experimentation will never occur again, and a financial settlement."

55.     Despite the Olsons' demand for the truth, and the injustice inflicted on the family not just by the death of Dr. Olson but by years of deceit on the part of the CIA, members of President Ford's administration sought immediately to prevent disclosure and to induce settlement under false pretenses.  On July 11, Richard Cheney, then Deputy Chief of Staff to President Ford, wrote a memorandum to then Chief of Staff Donald Rumsfeld concerning "The

Olson Matter/CIA Suicide."  In that memorandum, Mr. Cheney noted that the administration had

not yet fully investigated the circumstances surrounding Dr. Olson's death, and that there were

"serious legal questions that [would] have to be resolved concerning the Government's

responsibility."  He also expressed concern that it "might be necessary to disclose high-level

classified national security information in connection with any court suit."

56.     On July 16, then White House Counsel Roderick Hills followed up on

Mr. Cheney's memorandum by suggesting that the Olsons be invited to meet with the President

to entice them to settle, rather than sue the United States government in tort.  In support of this

recommendation, Mr. Hills noted that although the government had previously concluded that

Dr. Olson had died "in the course of his official duties," the "bizarre circumstances of

[Dr. Olson's death] could well cause a court of law to determine as a matter of public policy that

[Dr. Olson] did not die in the course of his official duties."  Hills further expressed concern that,

given the "sensitive" nature of Dr. Olson's job, it was "highly unlikely" that the United States

government would be willing to produce relevant documents to the Olsons, as would be required

during discovery.  Mr. Hills therefore concluded that "*as a practical matter* [*the United States*

*government*] *would have no defense against the Olson suit*" (emphasis added).  Recognizing the

viability of a potential claim by the family against the government, the government continued its

pattern of concealment and deceit in order to attempt to defeat by the passage of time what it

knew it could not defend on the merits.

57.     On July 21, Dr. Olson's widow, daughter, and his two sons met with President

Ford in the Oval Office.  Upon information and belief, President Ford told the Olsons that he was

distressed that the family had not previously been told the truth regarding Dr. Olson's death.  The

President did not, however, tell the family that Dr. Olson had not committed suicide.

58.     The day after the Olson family met with President Ford, a congressional committee questioned former CIA General Counsel Lawrence Houston regarding CIA employees' involvement in Dr. Olson's death.  Mr. Houston acknowledged that based on the memorandum of understanding between the CIA and DOJ—an arrangement that the Committee on Government Operations called "improper" and "probably illegal"—the CIA had not reported its employees' actions for possible criminal investigation.  In response to a series of questions about Dr. Olson, Mr. Houston also agreed that in certain cases, the CIA had effectively "give[n] immunity to individuals who happened to work for the CIA for all kinds of crimes, including possibly murder."

59.     On July 24, 1975, the Olson family met with then CIA Director William Colby. Director Colby apologized for any role that the CIA played in Dr. Olson's "suicide."  Director Colby did not, however, tell the family (as he divulged in his memoir four years later) that Dr. Olson had been a CIA officer.

60.     Following this meeting, the CIA provided the Olson family with some documentation regarding Dr. Olson and the circumstances surrounding his death.  After reviewing those documents, the Olson family stated that it had "a series of questions regarding the quality of [the CIA's] investigation."  The family also reiterated its insistence that the CIA disclose all relevant information regarding Dr. Olson's death.

61.     In response to this complaint, the CIA provided additional documents to the Olson family.  The CIA's Inspector General represented that, with this production, the CIA had provided the Olsons with "each and every record relating to the death of Frank R. Olson and the events leading thereto."  This, however, was untrue.

62.     In September 1975, the Olson family announced that it intended to sue the CIA unless the parties could reach a settlement agreement.  Following this announcement, White House Counsel Roderick Hills reiterated to supervisors at the White House his concern that there was a "significant possibility" that a lawsuit would lead to the disclosure of documents regarding the "sensitive" nature of Dr. Olson's job and the facts underlying Dr. Olson's "bizarre death."

63.     Mr. Hills also explained that although the Olsons previously had received funds based on the government's finding that Dr. Olson had died in the course of his official duties, there was "a real possibility that an appellate court would decide that as a matter of law when one dies under the circumstances such as those causing Dr. Olson's death, he cannot be said to have died 'in the course of his employment.'"  Again, the government chose to obfuscate the truth in order to deter the family from pursuing a claim that the government was concerned would reveal the true facts of Dr. Olson's death and that it believed it might lose.

64.     Based on previous discussions, the CIA knew or should have known that the Olsons would agree to settle only if the CIA completely and accurately disclosed all information related to Dr. Olson's death.  The CIA accordingly communicated, falsely, that it had done so. Congress then passed Private Law No. 94-126, which authorized and directed the Treasury to pay $187,500 to each member of the Olson family "in full settlement of [the Olson family's] claims against the United States arising out of the death of Doctor Frank R. Olson in November 1953, if all [members of the Olson family] waive any and all rights arising out of such death." The Olsons would not have accepted the money authorized by the private law had they been told the truth at the time.  Moreover, the family's acceptance of those funds was induced by the CIA's false representation that it had disclosed all relevant information regarding the circumstances of Dr. Olson's death.  In reality, instead of providing Dr. Olson's survivors with

the answers that they deserved, the CIA had not—and still has not—disclosed the truth regarding

Dr. Olson's death, depriving his survivors both of long-sought closure and well-deserved relief.

**Lingering Questions, Continued Cover-Up**

65.     In 1993—eighteen years after the CIA claimed to have disclosed the full story

regarding Dr. Olson's death to the Olson family—former CIA Director Colby sent Plaintiff Eric

Olson a message.  Former Director Colby offered to discuss Dr. Olson's death with him further,

indicating that there was more to tell.

66.     Based in part on former Director Colby's message, Plaintiffs questioned whether

the CIA had told them the full truth regarding their father's death.  Once again, after years spent

attempting to assimilate the government's second false explanation of the circumstances of their

father's death, Plaintiffs were confronted with the likelihood that there was yet more to the story.

Accordingly, in June of 1994, Plaintiffs Eric and Nils Olson took the extraordinary step—

administratively, financially, and emotionally—of having Dr. Olson's body exhumed so that a

full autopsy could be performed.

67.     The 1994 autopsy revealed that, contrary to the medical examiner's report at the

time of death, there were no lacerations on Dr. Olson's body.  The autopsy also revealed a

previously undisclosed hematoma on Dr. Olson's temple.  Dr. James Starrs of The George

Washington University, a prominent practitioner and professor of criminal law and forensic

science, concluded that the hematoma had resulted from a blow to the head that occurred before

Dr. Olson went through the window of the Statler Hotel.  After first being told that their father

had died in an accident, and then that he had committed suicide, Plaintiffs now had to grapple

with the horrifying news that their father may have been murdered and that those responsible

might never face justice.

68.     Based in part on the exhumation and autopsy, on April 18, 1996, Stephen Saracco and Daniel Bibb of the New York District Attorney's Cold Case Unit sent a letter to the CIA indicating that the District Attorney's Office planned to reopen its investigation into Dr. Olson's death.  In that letter, Mr. Bibb and Mr. Saracco requested all CIA documents pertaining to Dr. Olson's death.  They also indicated that they wished to interview former CIA officials including Dr. Gottlieb, Dr. Lashbrook, Col. Ruwet, and former Director Colby.

69.     On April 27, 1996, former Director Colby, who had previously indicated that the CIA had not actually disclosed all relevant information, disappeared under suspicious circumstances.  His body was found nine days later.

70.     After a years-long reinvestigation into Dr. Olson's death, the New York District Attorney's office was unable to confirm definitively the circumstances surrounding Dr. Olson's death.  It accordingly changed the official cause of death for Dr. Frank Olson from "suicide" to "unknown."

71.     Eric and Nils Olson have repeatedly demanded that the CIA reveal the truth regarding their father's death, but negligently supervised CIA employees continually have refused to do so.  The CIA originally insisted that it had given the Olson family (including Plaintiffs) its complete file on Dr. Olson's death—which proved to be untrue—and it now refuses even to respond to the Olsons' questions regarding the files.  CIA representatives will only say that the CIA has provided all documents related to MKULTRA; when asked whether the CIA has disclosed all documents related to Dr. Olson's death, they merely repeat that the CIA has turned over all documents related to MKULTRA.

72.     As recently as February 2011, Plaintiffs have requested that the CIA meet with them to bring an end to the "deceit and false and deliberate CIA cover stories" that have

"emotionally and financially destroyed the [Olson] family." In response, negligently supervised employees of the CIA have continued to insist that "Agency records set forth a complete and accurate presentation of what happened to Dr. Olson." The CIA has not explained whether that conclusion is based on the files that it has disclosed to the Olson family (including Plaintiffs), or the files that it now refuses to produce.

73.     Dr. Olson's survivors have asked repeatedly to be told the truth. Each time, the government has responded with falsehoods. Plaintiffs continue to suffer injury, and to be deprived of the opportunity to know the facts, because the government has continually failed to disclose the truth regarding Dr. Olson's death.

## FIRST CLAIM FOR RELIEF
### (Negligent Supervision)

74.     Plaintiffs hereby incorporate all the preceding paragraphs of this Complaint.

75.     Under CIA policy, employees were permitted to test LSD on humans only after they received permission from the Deputy Director of Plans. CIA policy also required employees to advise the Assistant Deputy Director of Plans before testing LSD on humans.

76.     On November 19, 1953, Dr. Gottlieb and Dr. Lashbrook, two employees of the CIA, administered LSD to Dr. Frank Olson without Dr. Olson's knowledge or consent. Neither Dr. Gottlieb nor Dr. Lashbrook sought approval from Deputy Director of Plans Frank Wisner before engaging in this experiment, despite having been required by CIA policy to do so. They also did not notify Assistant Deputy Director of Plans Richard Helms. Likewise, Dr. Gottlieb's supervisor, Col. James Drum, neither sought approval from Mr. Wisner nor informed Mr. Helms in advance of the experiment. Despite this violation of policy, the CIA did not reprimand Dr. Gottlieb, Dr. Lashbrook, or Col. Drum.

77.     After Dr. Olson was given LSD at Deep Creek Lake without his knowledge or consent, Dr. Lashbrook and Col. Ruwet accompanied Dr. Olson to New York, purportedly for a "psychiatric" consultation with an alleged psychiatrist, who was actually an allergist.

78.     One night before Dr. Olson was to return to Washington, D.C., Dr. Lashbrook and Dr. Olson checked into the Statler Hotel in New York City.  They shared room 1018A—the room from which Dr. Olson fell to his death at 2:30 in the morning after having sustained a blow to the head.  The circumstances surrounding the death mirrored those detailed in an assassination manual that, upon information and belief, the CIA had drafted that same year.

79.     Immediately after Dr. Olson fell from the thirteenth story of the Statler Hotel, Dr. Lashbrook made a series of phone calls, including a call to his supervisor, Dr. Gottlieb. During one of those calls, Dr. Lashbrook said, "Well he's gone," and the voice on the other end responded, "That's too bad."  Dr. Lashbrook never inquired into Dr. Olson's condition, and he never called the police.

80.     Several times, Dr. Lashbrook changed his story regarding the moments before Dr. Olson fell to his death.

81.     Neither at the time of Dr. Olson's death, nor at any subsequent time, in spite of multiple requests by his survivors, has the CIA been fully forthcoming with the facts surrounding his death.

82.     In 1976, the Church Committee investigated the United States' intelligence activities and found that the CIA had a history of "numerous failures in the monitoring and control of the testing and use of chemical and biological weapons."

83.     Among those "numerous failures," the Church Committee cited the CIA for "irresponsible supervision" related to the experiment at Deep Creek Lake, which the CIA itself had determined was causally related to Dr. Olson's death.

84.     Given that the CIA had failed to properly monitor and control its employees in their testing of chemical and biological agents on "numerous" other occasions, the CIA was on notice that its employees had the propensity to act outside the bounds of CIA policy.

85.     As a result of the CIA's gross negligence, and a result of the actions or omissions of CIA employees, Plaintiffs have suffered and continue to suffer significant emotional harm. This emotional harm has been exacerbated by the continued negligent supervision of CIA employees who have egregiously and continuously failed to disclose the truth regarding Plaintiffs' father's wrongful death.  These failures to disclose the truth continue to this day.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs seek judgment as follows:

a.      That judgment be entered in favor of Plaintiffs and against Defendant for compensatory damages in an amount to be determined at trial;

b.      For an award of costs incurred in prosecuting this action; and

c.      For such other and further relief as the Court deems just and proper.

## JURY REQUEST

Plaintiffs hereby request trial by jury.

Dated: November 28, 2012                    Respectfully submitted,

                                            By: _____
                                            **GILBERT LLP**
                                            Scott D. Gilbert, D.C. Bar No. 290932
                                            Mark A. Packman, D.C. Bar No. 336321
                                            Lucian C. Martinez, Jr., D.C. Bar No. 977042
                                            1100 New York Ave. NW, Suite 700
                                            Washington, D.C. 20005
                                            Telephone:  (202) 772-2200
                                            Facsimile:  (202) 772-3333

                                            *Attorneys for Plaintiffs Eric and Nils Olson*