UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ERIC OLSON and NILS OLSON,**<br><br>    Plaintiffs,<br><br>        v.<br><br>**UNITED STATES OF AMERICA,**<br><br>    Defendant. | Civil Action No. 12-1924 (JEB) |

**MEMORANDUM OPINION**

In 1953, CIA employees slipped LSD into a scientist's drink. The acid trip turned fatal when the scientist, while under the CIA's care, fell thirteen stories from a hotel window. Or so the CIA would have us believe. According to his children, the scientist's "accidental death" was in fact a secret assassination, suppressed by the CIA to this day. In this suit, the scientist's sons sue the United States for negligently supervising the CIA employees who carried out the murder and subsequent cover-up. The United States has now moved to dismiss. Concluding that most of the allegations are both untimely and waived by a prior settlement agreement, and that any timely or preserved claims fall outside of the United States' waiver of sovereign immunity, the Court will grant the Government's Motion.

**I.     Background**

Although mention of LSD (lysergic acid diethylamide) conjures in the popular imagination the 1960s escapades of Ken Kesey and his Merry Pranksters, see Tom Wolfe, The Electric Kool-Aid Acid Test (1968), government study of its effects predates this by a decade. According to the Complaint, in fact, the CIA began testing LSD on human subjects in 1953. See Compl., ¶¶ 10-12. Dr. Frank Olson, father of Plaintiffs Eric and Nils Olson, was a bioweapons

1

expert. See id., ¶¶ 15-16. He worked at the Special Operations Division of the U.S. Army's Biological Laboratory, which collaborated with the CIA, and was privy to a great deal of sensitive information on biological weapons and mind-control techniques. See id., ¶¶ 14-17. In 1953, CIA contacts came to suspect that Olson had serious misgivings about the Agency's work in these fields and thus posed a security risk. See id., ¶¶ 18-21.

While the Court must limit its analysis to the four corners of the Complaint, the skeptical reader may wish to know that the public record supports many of the allegations that follow, farfetched as they may sound.

    A.  The Alleged Murder

Olson participated in a joint meeting between employees of Special Operations and the CIA on November 19, 1953. See id., ¶¶ 22-23. During the meeting, Dr. Robert Lashbrook from the Chemical Division of the CIA's Technical Support Staff secretly put LSD in a bottle of Cointreau. See id., ¶ 23. Several people – including Olson – drank from the bottle, unknowingly taking the drug. See id. The proper CIA officials never sanctioned the experiment. See id., ¶¶ 13, 24.

The Complaint gives a spotty account of the days that followed. On November 24, Olson told a colleague that he wanted to resign, perhaps in part because he had unwittingly been made a human guinea pig. See id., ¶ 25. The colleague told Lashbrook, who, with others, took Olson to New York City to see a doctor. See id., ¶¶ 25, 27. Although Olson's wife was told that he went to New York for psychiatric treatment, in reality he saw only an allergist, who gave Olson a sedative, to be taken as necessary. See id., ¶¶ 26-28. The CIA men then returned with Olson to Washington for a single day on November 26 (Thanksgiving Day), but did not permit him to see his family because of continued "psychiatric treatment." See id., ¶ 29. Lashbrook then took

Olson back to New York on November 27, where the allergist recommended hospitalization for further psychiatric treatment. See id., ¶ 30. Olson nonetheless called his wife and told her that he would be home the next day. See id., ¶ 31. But fate (or perhaps the CIA) intervened.

The night of November 27, Lashbrook and Olson shared a room at the Statler Hotel in Manhattan. See id., ¶¶ 31-32. Both had two martinis before bed. See id., ¶ 32. At 2:30 a.m. on November 28, Olson fell out of the window of his hotel room, tumbling thirteen stories to his death. See id. Eric Olson was nine years old; his brother Nils was five. See id., ¶ 43.

According to the Complaint, Dr. Olson's death bears a striking resemblance to a "secret assassination" technique described in a CIA manual from that era:

> The manual suggested that "[f]or secret assassination . . . the contrived accident is the most effective technique" because "[w]hen successfully executed, it causes little excitement and is only casually investigated." Specifically, the manual counseled that "[t]he most efficient accident . . . is a fall of 75 feet or more onto a hard surface . . . [such as one from] unscreened windows." The manual also recommended that assassins use a blunt object to inflict "[b]lows . . . directed to the temple," but noted that "[c]are is required to insure [sic] that no wound or condition not attributable to the fall is discernible after death." Finally, the manual suggested that "[i]f the subject's personal habits make it feasible, alcohol may be used . . . to prepare him for a contrived accident of any kind."

Id., ¶ 34 (all alterations in original). Indeed, this would be the precise *modus operandi* the CIA is alleged to have employed here.

B. The Alleged Cover-Up

After the death, the CIA told the Olson family only that Dr. Olson had died in a terrible accident in the course of his duties and that the body was too disfigured for a viewing. See id., ¶¶ 37, 41. Because the CIA classified the death as occurring during his official duties, the Olsons received regular benefits under the Federal Employees' Compensation Act. See id., ¶ 39.

3

While the family remained in the dark, the CIA immediately investigated the death. A classified report soon found that the LSD experiment had a "direct causal connection" with the death. See id., ¶ 40. An internal investigation criticized the employees involved in the LSD experiment, but issued no formal reprimands. See id., ¶¶ 44-45. Lashbrook gave inconsistent statements after the death, contradicting himself on details about the hotel room and on whether he had seen Olson jump from the window. See id., ¶ 36.

The Olson family finally learned of the LSD link in 1975. That year, President Gerald Ford formed a Commission on CIA Activities Within the United States, headed by Vice President Nelson Rockefeller. See id., ¶ 51. A report by the Commission disclosed the connection between Olson's death and the LSD experiment for the first time. See id., ¶¶ 51-53. The Olsons soon demanded full disclosure of the events surrounding the death and a financial settlement, see id., ¶ 54, which lit a fuse at the White House. Deputy Chief of Staff Richard Cheney wrote a memo to Chief of Staff Donald Rumsfeld, warning that a lawsuit could force disclosure of classified information. See id., ¶ 55. White House Counsel Roderick Hills concurred, suggesting a meeting with the President to induce a settlement. See id., ¶ 56. Days later, the Olson family met with President Ford, see id., ¶ 57, and then with CIA Director William Colby, who apologized for the CIA's role in Dr. Olson's "suicide." See id., ¶ 59. After some prodding, the CIA handed over documents on the death, telling the Olsons that they now had "each and every record relating to the death of Frank R. Olson and the events leading thereto." Id., ¶¶ 60-61.

The Olson family eventually reached a settlement with the Government, which was authorized by and codified in Private Law 94-126:

> *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the

> Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, the sum of $187,500 each to Alice W. Olson, Lisa Olson Hayward, Eric Olson, and Nils Olson, in full settlement of all of their claims against the United States arising out of the death of Doctor Frank R. Olson in November 1953, if all of them waive any and all rights arising out of such death. The payment of such sums shall be in full satisfaction of all claims of Alice W. Olson, Eric Olson, Lisa Olson Hayward, and Nils Olson of any nature whatsoever against the United States, or against any past or present employee or agent of, or person associated with, the United States, his estate or personal representative, in connection with the circumstances surrounding such death and such payments shall be in lieu of further compensation otherwise due under [the Federal Employees' Compensation Act], or any award thereunder.

90 Stat. 3006, 3006 (1976); see also Compl., ¶ 64. In accepting the settlement, Plaintiffs say, they relied on the CIA's assurances that all documents relevant to the circumstances surrounding the death had been turned over. See Compl., ¶ 64.

Eighteen years later, former CIA Director Colby reopened the can of worms. In 1993, he sent Eric Olson a message indicating there was more to tell about his father's death. See id., ¶ 65. Unlike the account of another CIA head's deathbed confessions, see Bob Woodward, Veil: The Secret Wars of the CIA, 1981-1987 (1987) (discussing William Casey's revelations), the Complaint never indicates what, if anything, Colby revealed. Now questioning the CIA story once again, Plaintiffs exhumed Dr. Olson's body in 1994. See Compl., ¶ 66. An autopsy revealed a hematoma on Olson's temple, resulting (according to a forensic scientist) from a blow to the head before the fall – that is, an injury seemingly inconsistent with suicide but consistent with the "secret assassination" described in the CIA manual. See id., ¶ 67. Based on this finding, the New York District Attorney's Office reopened its file on Olson's death in 1996, eventually changing the cause of death from "suicide" to "unknown" after a long investigation. See id., ¶¶ 68, 70. Plaintiffs have repeatedly insisted – as recently as February 2011 – that the CIA disclose all relevant documents and reveal the truth about their father's death. See id.,

5

¶¶ 71-73. "[B]ut negligently supervised CIA employees continually have refused to do so." Id., ¶ 71.

Fed up, Eric and Nils Olson filed this suit against the United States on November 28, 2012, alleging a single count of negligent supervision under the Federal Tort Claims Act. The FTCA usually makes the Federal Government liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. In essence, the Complaint contends that consistent negligent supervision by the CIA caused Dr. Olson's murder in 1953 and six decades of cover-up. The Government now moves to dismiss.

## II.     Legal Standard

Under Federal Rule of Civil Procedure 12(b)(1), a court must dismiss a claim for relief when the complaint "lack[s] . . . subject-matter jurisdiction." To survive a motion to dismiss under Rule 12(b)(1), Plaintiffs bear the burden of proving that the Court has subject-matter jurisdiction to hear their claims. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000). A court has an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006). "For this reason 'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Grand Lodge of the Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987) (alteration in original)). Additionally, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens Pharm. v. FDA, 402 F.3d 1249, 1253

(D.C. Cir. 2005); see also Venetian Casino Resort, LLC v. EEOC, 409 F.3d 359, 366 (D.C. Cir. 2005) ("given the present posture of this case – a dismissal under Rule 12(b)(1) on ripeness grounds – the court may consider materials outside the pleadings"); Herbert v. Nat'l Acad. of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992).

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a claim for relief when the complaint "fail[s] to state a claim upon which relief can be granted."  In evaluating a motion to dismiss under Rule 12(b)(6), the Court must "treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation and internal quotation marks omitted); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint.  Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face."  Iqbal, 556 U.S. at 678 (internal quotation omitted).  Though a plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555-56 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

A motion to dismiss under Rule 12(b)(6) must rely solely on matters within the pleadings, see Fed. R. Civ. P. 12(d), which include statements adopted by reference as well as copies of written instruments joined as exhibits.  See Fed. R. Civ. P. 10(c).  Where the Court

7

must consider "matters outside the pleadings" to reach its conclusion, a motion to dismiss "must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); see also Yates v. District of Columbia, 324 F.3d 724, 725 (D.C. Cir. 2003).

**III.   Analysis**

The Government raises a series of jurisdictional and other threshold challenges to Plaintiffs' Complaint, arguing that: (1) venue in this District is improper; (2) Plaintiffs' "negligent supervision" claim is really a disguised claim for misrepresentation or deception, forbidden by the FTCA; (3) the FTCA's two-year statute of limitations bars the suit; and (4) the 1976 settlement precludes further lawsuits. The Court need not engage all these challenges, however, because the statute of limitations and settlement clearly dictate dismissal of most of the suit, and the FTCA's misrepresentation bar withholds jurisdiction over any piece that remains. See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp., 549 U.S. 422, 431 (2007) ("[A] federal court has leeway to choose among threshold grounds for denying audience to a case on the merits.") (internal quotation marks omitted).

   A.   Statute of Limitations

The Federal Tort Claims Act has a two-year statute of limitations: "A tort claim against the United States shall be forever barred <u>unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues</u> or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented." 28 U.S.C. § 2401(b) (emphasis added). The parties agree that although the Olsons filed suit within six months of the CIA's final denial of their latest FTCA claim, almost all of the negligent supervision at issue here occurred more than two years – and up to nearly 60 years – before they filed that administrative claim in early 2012.

For the meat of their suit to survive, then, Plaintiffs must find some way to reach back far more than two years.

Invoking the "discovery rule" might be the first thought. "Under the discovery rule, a cause of action accrues when the injured party discovers – or in the exercise of due diligence should have discovered – that it has been injured." Hardin v. Jackson, 625 F.3d 739, 743 (D.C. Cir. 2010) (internal quotation marks omitted); see also Kifafi v. Hilton Hotels Ret. Plan, 701 F.3d 718, 729 (D.C. Cir. 2012) ("absent a contrary congressional directive, this Court applies the discovery rule"). The Olsons, however, disclaim any reliance on the discovery rule. See Opp. at 23 ("Plaintiffs do not ask the Court to toll the statute of limitations on the claim on the basis of the discovery rule."). And with good reason. The Complaint makes clear that Plaintiffs have long thought that their father was murdered and that the CIA has been less than forthcoming about his death. See, e.g., Compl., ¶¶ 66-67 (body exhumed in 1994, revealing signs of murder); id., ¶¶ 71, 73 (despite repeated demands for truth, CIA continued to mislead). In other words, Plaintiffs discovered or should have discovered their injuries long ago, rendering the discovery rule inapt. Nor do they rely on the related doctrines of equitable estoppel or tolling to justify delay.

Instead, Plaintiffs invoke only the "continuing-violation doctrine." A continuing violation is – as the name suggests – a tort that persists for a long period of time, such as a hostile work environment. Under the continuing-violation doctrine, the statute of limitations for a continuing violation "begins to run only after the date of the last injury," Keohane v. United States, 669 F.3d 325, 329 (D.C. Cir. 2012), yet a plaintiff may recover for any injury sustained from the conduct – including an injury caused by "conduct that took place outside the limitations period." Earle v. District of Columbia, 707 F.3d 299, 306 (D.C. Cir. 2012).

The Government initially argues that § 2401(b) is jurisdictional and that the continuing-violation doctrine never applies to jurisdictional statutes. The Court need not address the characterization of § 2401(b) as jurisdictional or the interplay between equitable doctrines and jurisdiction, however, since the D.C. Circuit has said that the continuing-violation doctrine does apply to § 2401(b). See Page v. United States, 729 F.2d 818, 820-23 (D.C. Cir. 1984).

Not all repeated torts open the door to the continuing-violation doctrine, however. For the doctrine to apply, "the fact of the violation [must] become[] apparent only by dint of the cumulative effect of repeated conduct." Earle, 707 F.3d at 306. "For statute of limitations purposes, a continuing violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period, typically because it is only its cumulative impact (as in the case of a hostile work environment) that reveals its illegality." Taylor v. FDIC, 132 F.3d 753, 765 (D.C. Cir. 1997) (citations and internal quotation marks omitted). Neither "the lingering effect of an unlawful act" nor "the mere failure to right a wrong" constitutes a continuing violation. Earle, 707 F.3d at 306 (internal quotation marks omitted). Discrete unlawful acts, likewise, do not become a continuing violation simply because they are related. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act."). While a second strand of the doctrine covers cases in which "the text of the pertinent law imposes a continuing obligation to act or refrain from acting," Earle, 707 F.3d at 307, Plaintiffs have identified no such ongoing obligation here.

The problem for the Olsons is that the torts they allege are not continuing violations. Their "negligent supervision" claim against the CIA really divides into two: the events in 1953 that led to Dr. Olson's death, and the subsequent "cover-up" when the CIA allegedly stonewalled the family's attempts to find out more information.

As to the former, any negligent supervision surrounding the death itself could "reasonably have been expected to be made the subject of a lawsuit when it first occurred," because its character as a violation was "clear" without being "repeated during the limitations period." Taylor, 132 F.3d at 765 (internal quotation marks omitted). "Its 'character' as an alleged violation would have been clear had [Plaintiffs] inquired; no 'cumulative effect' was necessary to reveal its supposed illegality." Keohane, 669 F.3d at 330. Perhaps CIA deceptions about the death could have justified some period of equitable tolling – yet not, according to the Complaint, past the 1994 exhumation – but the continuing-violation doctrine offers no rescue.

As to the cover-up, Plaintiffs explain that they "do not seek recovery for a single incident, but for the 'cumulative impact' of the government's negligent supervision of its employees and the consequent, repeated inflictions of emotional distress spanning decades." Opp. at 25. Yet they identify no continuous tort. They point to "a host of ongoing misdeeds and illegal acts" when the CIA gave them misinformation: the CIA's initial 1953 account, the 1975 account preceding the settlement, and the responses to the Olsons' repeated requests for a full explanation (most recently in February 2011). See Opp. at 25-26 (internal quotation marks omitted); see also Compl., ¶¶ 37-73. But the similarity of the "misdeeds" does not make them continuous. Negligent supervision during the 1970s cover-up, for example, constituted a tort at the time – it was not transformed into a tort by CIA refusals to give further information in 2011. There was no need here to wait for events to "accumulate" before suing. See Earle, 707 F.3d at

11

306-07. "A series of wrongful acts creates a series of claims." Heard v. Sheahan, 253 F.3d 316, 318 (7th Cir. 2001).

If Plaintiffs' theory were right, the statute of limitations would never definitively run. They could wait another decade, request additional information from the CIA, and then (deeming the response inadequate on account of negligent supervision) sue for every instance of "negligent supervision" since 1953. The continuing-violation doctrine does not stretch so far. Section 2401(b) therefore bars recovery for all negligent supervision before early 2010 – *i.e.*, more than two years before Plaintiffs' administrative FTCA claim with the CIA. All that remains is the allegedly negligent supervision that resulted in misrepresentation in 2011. The Court will address those allegations in Part III.C, *infra*.

It is not entirely clear whether this dismissal should be under Rule 12(b)(1) for want of subject-matter jurisdiction or Rule 12(b)(6) for failure to state a claim. While the D.C. Circuit has often called the parallel § 2401(a) "jurisdictional," at least two panels have expressed doubt about that label. See P & V Enters. v. U.S. Army Corps of Eng'rs, 516 F.3d 1021, 1026-27 & n.2 (D.C. Cir. 2008); Harris v. FAA, 353 F.3d 1006, 1013 n.7 (D.C. Cir. 2004). An unpublished decision, moreover, declares (without explanation) that § 2401(b) is "not jurisdictional in nature." Tucker v. Dep't of Army, No. 02-5178, 2002 WL 31741510, at *1 (D.C. Cir. 2002). And a recent Supreme Court dissent argues – without contradiction – that § 2401(a) is probably not jurisdictional under the test for jurisdiction dictated by recent precedent. See John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 145-46 (2008) (Ginsburg, J., dissenting). Because nothing here turns on the labeling, however, the Court "need not determine whether the dismissal [is] pursuant to 12(b)(1) or 12(b)(6)." Harris, 353 F.3d at 1013 n.7.

B.  <u>Settlement Agreement</u>

Another threshold barrier also blocks Plaintiffs' recovery.  In 1976, they accepted a "full settlement of all of their claims against the United States arising out of the death of Doctor Frank R. Olson in November 1953," under which they "waive[d] any and all rights arising out of such death."  90 Stat. at 3006; <u>see also</u> Compl., ¶ 64.  The private law specified that "[t]he payment of such sums shall be in full satisfaction of all claims of . . . Eric Olson . . . and Nils Olson of any nature whatsoever against the United States, or against any past or present employee or agent of, or person associated with, the United States, his estate or personal representative, in connection with the circumstances surrounding such death."  90 Stat. at 3006.  The Plaintiffs received $187,500 each for their waiver.  <u>See id.</u>  The Government properly argues that this settlement agreement, too, bars the Olsons' suit.

Plaintiffs initially launch a lengthy attack on the settlement itself, arguing that it was "induced by fraud."  <u>See</u> Opp. at 32-34; <u>see also</u> Compl., ¶ 64 (same).  To adjust or rescind their settlement, however, Plaintiffs would have to go to the Court of Claims.  The Tucker Act gives the Court of Federal Claims "jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1).  That jurisdiction is exclusive for claims exceeding $10,000.  <u>See</u> 28 U.S.C. 1346(a)(2); <u>Clinton v. Goldsmith</u>, 526 U.S. 529, 539 n.13 (1999).  Included in this exclusive jurisdictional grant are "situations where something looking like a contract came into existence, but the plaintiff asserts that pre-contract behavior by the government necessitates some adjustment of contract terms, including damages, reformation, or . . . rescission or restitution."  <u>Kline v. Cisneros</u>, 76 F.3d 1236, 1239 (D.C. Cir. 1996).  Settlement agreements are considered contracts for purposes of the Tucker Act.  <u>See</u> <u>Hansson v. Norton</u>, 411 F.3d 231, 232 (D.C. Cir.

2005); Brown v. United States, 389 F.3d 1296 (D.C. Cir. 2004). In other words, this Court lacks jurisdiction to decide whether the 1976 settlement agreement was induced by fraud.

Apparently preferring this forum, however, Plaintiffs back off their condemnation of the settlement, declaring that they "do not ask this Court to set aside the 1976 settlement," and they "argue only that the settlement does not bar the present Complaint." Opp. at 34. The Court will therefore take the settlement as valid and binding on Plaintiffs.

Under the settlement, Plaintiffs have "waive[d]" any claim against the United States "in connection with the circumstances surrounding" Dr. Olson's death. The plain language of that waiver covers any negligent supervision that led up to his demise. See Compl., ¶¶ 14-35, 44-50. Because Plaintiffs intentionally relinquished any right to recover for the death, allegations relating to negligent supervision during that time must be dismissed (in the alternative to the statute-of-limitations dismissal) under Rule 12(b)(6).

The waiver might well also cover negligent supervision of CIA communications to the family in the years following the death (*i.e.*, the cover-up). See Compl., ¶¶ 36-43, 51-73. The Court need not resolve that question here, however. As explained below, see Part III.C, *infra*, the FTCA bars recovery for those cover-up allegations because a suit based on them would "aris[e] out of . . . misrepresentation [or] deceit."

C. Jurisdiction over Claims for Misrepresentation or Deceit

To the extent the Olsons seek compensation for negligent supervision within the statute of limitations or outside of the settlement, the Court lacks subject-matter jurisdiction. While 28 U.S.C. § 1346(b)(1) grants district courts jurisdiction over tort claims against the United States, "[t]he provisions of . . . section 1346(b) of this title shall not apply to . . . [a]ny claim arising out of . . . misrepresentation [or] deceit." 28 U.S.C. § 2680(h). Section 2680 thus divests courts of

jurisdiction over claims falling within its exceptions. See, e.g., Harbury v. Hayden, 522 F.3d 413, 422-23 (D.C. Cir. 2008). A plaintiff may not plead around § 2680(h) by asserting that the Government negligently failed to prevent a covered tort: "Respondent cannot avoid the reach of § 2680(h) by framing her complaint in terms of negligent failure to prevent the assault and battery. Section 2680(h) does not merely bar claims <u>for</u> assault or battery; in sweeping language it excludes any claim <u>arising out of</u> assault or battery. We read this provision to cover claims like respondent's that sound in negligence but stem from a battery committed by a Government employee." United States v. Shearer, 473 U.S. 52, 55 (1985) (plurality opinion) (emphasis in original).

Here, it is clear that Plaintiffs' recent grievances are for misrepresentation or deceit – not "negligent supervision." They complain of "continued cover-up," "refus[als]," "falsehoods," and "deceit and false and deliberate CIA cover stories." Compl., ¶¶ 71-73 (internal quotation marks and some capitalization omitted). Those recent activities came after "years of deceit," "false representation," and a "pattern of concealment and deceit" orchestrated by the Government's principals – the Director of Central Intelligence, the White House Deputy Chief of Staff and Chief of Staff, the White House Counsel, and the President himself. See id., ¶¶ 55-64. True, Plaintiffs slap "negligently supervised" in front of some assertions. See, e.g., Opp. at 1 ("Negligently supervised CIA employees have spent the last sixty years covering up this crime and continue to do so."). But it is clear that their challenge is founded on deceit by the CIA and prominent officials, not negligent supervision. Even if the Complaint were narrowed to a negligent failure to prevent misrepresentation and deception by CIA employees, moreover, § 2680(h) would still act as a bar. See Shearer, 473 U.S. at 55 (plurality opinion). By operation

of § 2680(h), therefore, this Court lacks jurisdiction over any timely or unwaived facets of Plaintiffs' Complaint.

## IV. Conclusion

For the aforementioned reasons, the Court will grant the Government's Motion to Dismiss. A separate Order consistent with this Opinion will be issued this day.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: July 17, 2013